142 So.2d 705

**E. H. MILSTEAD**

v.

**ATLANTIC COAST LINE RAILROAD COMPANY et al.**

6 Div. 633.

Supreme Court of Alabama.

May 10, 1962.

Rehearing Denied June 28, 1962.

Wm. M. Acker, Jr., Smyer, White, Reid & Acker, Birmingham, for appellant.

Cabaniss & Johnston, E. T. Brown, Jr., and Drayton T. Scott, Birmingham, and Marshman, Hornbeck, Hollington, Steadman & McLaughlin, Harold N. McLaughlin and Clarence E. Weisell, Cleveland, Ohio, for appellees Grand International Brotherhood of Locomotive Engineers, and C. C. Griggers.

Rives, Peterson, Pettus & Conway and Erle Pettus, Jr., Birmingham, and Heiss, Day & Bennett, Harold C. Heiss and Russell B. Day, Cleveland, Ohio, for appellee Brotherhood of Locomotive Firemen and Enginemen.

Peyton D. Bibb, Birmingham, for appellee Atlantic Coast Line R. Co.

SIMPSON, Justice.

This appeal is pursuant to Title 7, § 819, Code 1940, from a judgment of the Circuit Court of Jefferson County overruling the appellant's demurrers to the pleas in abatement filed by appellees, which said ruling caused appellant to suffer a non-suit.

The original complaint sought a declaratory judgment and $20,000 damages for loss of wages alleged as the result of a collusive and discriminatory misconstruction and misapplication by appellees of certain memoranda which amended the collective bargaining agreement, the effect of which was to deny the appellant his correct seniority status as a locomotive engineer.

Appellant's original complaint named as defendants the Atlantic Coast Line Railroad Company, the Locomotive Firemen and Enginemen (Firemen), Grand International Brotherhood of Locomotive Engineers (Engineers), C. C. Griggers, W. W. Daniel, W. S. Slaughter, and T. T. Jackson, Jr. The complaint made Daniel, Slaughter, Jackson, and Griggers parties, not because of a charge of personal misconduct, but because they were carried on the seniority roster ahead of appellant. Because Daniel, Slaughter, and Jackson resided in Georgia, appellant obtained service pursuant to Title 7, § 201, Code 1940. Others were personally served in Alabama. Defendants Firemen, Jackson, Daniel and Slaughter filed motions to quash, and the court sustained motions of Jackson, Slaughter and Daniel. All defendants filed special pleas in abatement, designated A, B, C, D, E, F, G, H, and I, to which appellant demurred separately and severally. All of the pleas in abatement, except plea I, relied upon the proposition that the National Railroad Adjustment Board was the only appropriate forum for hearing the controversy. Plea I sought to set up as matter in abatement, the decree of the U. S. District Court of the Southern Division of the Northern District of Alabama remanding the cause to the Circuit Court for the Tenth Judicial Circuit of Alabama, after the defendants had removed it there. Appellant amended his complaint and defendants Atlantic Coast Line Railroad Company, Firemen, Engineers, and Griggers reinterposed pleas in abatement B, D, F, H, and I, striking pleas A, C, E, and G. Demurrers were again filed by appellant. The court sustained appellant's demurrer to plea I, but overruled his demurrer to pleas in abatement B, D, F, and H, in effect holding that the court had no jurisdiction over the subject matter because of the exclusive jurisdiction of the National Railroad Adjustment Board.

Appellant states that the pleas in abatement simply state legal conclusions based upon the fact that appellant is an employee of A. C. L. Railroad Company, that the

only forum presently open to appellant for the adjudication of the alleged grievance is the National Railroad Adjustment Board.

It is conceded by appellant at the outset that Davis v. Southern Railway Co., (1951), 256 Ala. 202, 54 So.2d 308, must be overruled if he is to prevail. The question presented in the Davis case is precisely the case we have before us here. The question there, as here, was whether or not appellant, who was presently an employee of the railroad, could maintain an action in the courts for damages for loss of seniority rights, involving the interpretation of a bargaining agreement, before he had exhausted his administrative remedies provided by the Railway Labor Act.

In view of the numerous decisions which have been rendered by the Supreme Court of the United States and various appellate courts of other jurisdictions since the Davis case, we believe it appropriate to look once again at this matter.

The pertinent provision is Title 45, § 153, U.S.C.A., which, in part, reads:

"(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes *may* be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." (Emphasis ours.)

At the time we decided the Davis case, there were several decisions of the Supreme Court of the United States construing this section. The leading case was Moore v. Illinois Central R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, decided in 1941. Next came Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950), and Order of Railway Conductors of America v. Southern Railway Co., 339 U.S. 255, 70 S.Ct. 585, 94 L. Ed. 811 (1950). The Moore case was a suit by a discharged employee against the railroad. The contention was there made by the company that a discharged employee had failed to exhaust the administrative remedies provided by the Railway Labor Act. The court said, however:

"But we find nothing in that Act which purports to take away from the courts the jurisdiction to determine a controversy over a wrongful discharge or to make an administrative finding a prerequisite to filing a suit in court. * * * It is to be noted that the section pointed out, § 153(i), as amended in 1934, provides no more than that disputes *'may* be referred * * * to the * * * Adjustment Board * * *.' It is significant that the comparable section of the 1926 Railway Labor Act (44 Stat. 577, 578) had, before the 1934 amendment, provided that upon failure of the parties to reach an adjustment a 'dispute *shall* be referred to the designated adjustment board by the parties, or by either party * * *.' Section 3(c). This difference in language, substituting 'may' for 'shall', was not, we think, an indication of a change in policy, but was instead a clarification of the law's original purpose."

The Supreme Court of the United States seemed to have limited this language, however, in the Slocum case, supra. That case, as well as Order of Railway Conductors of America v. Southern Railway Co., supra, involved disputes between the railroad and the union. In that situation, the court said in Slocum:

"Section 3 of the Railway Labor Act confers jurisdiction on the National Railroad Adjustment Board to hold

hearings, make findings, and enter awards in all disputes between carriers and their employees 'growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.' * * *

"The first declared purpose of the Railway Labor Act is 'To avoid any interruption to commerce or to the operation of any carrier engaged therein'. * * * This purpose extends both to disputes concerning the making of collective agreements and to grievances arising under existing agreements. * * * Carriers are therefore required to negotiate with the bargaining representatives of the employees. * * *

"This type of grievance [i. e. one between carrier and union] has long been considered a potent cause of friction leading to strikes. It was to prevent such friction that the 1926 Act provided for creation of various Adjustment Boards by voluntary agreements between carriers and workers. * * * But this voluntary machinery proved unsatisfactory, and in 1934 Congress, with the support of both unions and railroads, passed an amendment which directly created a national Adjustment Board * * *."

The Court then went on to hold that the court below (the State Court of New York) should have refused to adjudicate a jurisdictional dispute involving the railroad and two employee accredited bargaining agents. It distinguished the Moore case, saying:

"Our holding here is not inconsistent with our holding in Moore v. Illinois Central R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089. Moore was discharged by the railroad. He could have challenged the validity of his discharge before the Board, seeking reinstatement and back pay. Instead he chose to accept the railroad's action in discharging him as final, thereby ceasing to be an employee, and brought suit claiming damages for breach of contract. As we there held, the Railway Labor Act does not bar courts from adjudicating such cases. * * *"

but, the Court said:

"We hold that the jurisdiction of the Board to adjust grievances and disputes of the type here involved is exclusive."

However, the Court noted:

"We are not confronted here with any disagreement or conflict in interest between an employee and his bargaining representative, as in Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173." (Footnote 7.)

It was in this climate that we were called upon to decide the Davis case. At that time it appeared that the Slocum case, supra, was controlling. We relied upon it in holding that an employee (one still in the employ of the carrier) must exhaust his administrative remedies as provided in the Railway Labor Act. It is possible that in so holding we overlooked the significance of the Steele case. The cases which have followed Steele would seem to so indicate. That case was decided in 1944 and involved a suit by a Negro employee against both the railroad and the union. There (in Steele) protests and appeals of petitioner addressed to the carrier and the union to secure relief and redress were ignored. He alleged that the Brotherhood was the exclusive bargaining agent and in that capacity it was under an obligation and duty to represent the Negro fireman impartially and in good faith, but instead it had been hostile and disloyal to Negro firemen, "has deliberately discriminated against them, and has sought to deprive them of their seniority rights and to drive them out of employment in their craft". The bill asked, inter alia, for a declaratory judgment as to their rights and for damages against the Brotherhood for its wrongful conduct. This Court (Ala-

bama Supreme Court) had held, on the merits, that the complaint stated no cause of action in that it was believed that the Brotherhood was empowered by the Act to enter into the agreement and by virtue of the statute that the Brotherhood had power to create by agreement with the railroad seniority rights of the petitioner and to destroy them. In reversing, the Supreme Court of the United States said:

"Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among the members of the craft discriminations not based on such relevant differences. Here the discriminations based on race alone are obviously irrelevant and invidious. * * *

"So long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of the craft. While the statute does not deny to such a bargaining labor organization the right to determine eligibility to its membership, it does require the union, in collective bargaining * * * to represent non-union or minority union members of the craft without hostile discrimination, fairly, impartially, and in good faith."

The Court then went on to point out that the Act

"* * * *makes no reference to disputes between employees and their representative.* Even though the dispute between the railroad and the petitioner were [sic] to be heard by the Adjustment Board, that Board could not give the entire relief here sought. The Adjustment Board has consistently declin-

ed in more than 400 cases to entertain grievance complaints by individual members of a craft represented by a labor organization. 'The only way that an individual may prevail is by taking his case to the union and causing the union to carry it through to the Board.' " (Emphasis added.)

The petitioner was held to have a remedy in Court. To like effect was Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, likewise involving a Negro employee suing the union.

We were of the opinion in 1951 when the Davis case was decided that the Supreme Court of the United States had limited this line of cases to those involving racial discrimination. However, later developments indicate that other types of discrimination may be the key which opens the judicial door. Mount v. Grand International Brotherhood of Locomotive Engineers, 226 F.2d 604 (Sixth Circuit), cert. den. 350 U.S. 967, 76 S.Ct. 436, 100 L.Ed. 839, was decided in 1955 by the Sixth Circuit. Appellee there contended that the Steele and Tunstall cases involved racial discrimination only and therefore were not controlling. The Circuit Court of Appeals answered:

"We are of the opinion that the cases are not so limited. It is true that the particular discrimination involved in those cases was based upon race, but the rulings are based upon the broad principle that the Railway Labor Act prohibits 'hostile discrimination' between members of the craft, irrespective of whether it is based on race or some other ground unrelated to race. * * * 'Hostile discrimination' is not limited to discrimination on account of race."—Citing in support the Steele case, supra, and Howard case, infra.

This reasoning following the dissenting opinion in Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283, where it was stated in this racial discrimination case:

"It would have been the same if the Brotherhood had discriminated against him on some other ground, unrelated to race. It was the Brotherhood's duty 'to act on behalf of all the employees which, by virtue of the statute, it undertakes to represent.' "

In 1957, the Supreme Court of the United States again had before it a case involving Negro workmen in Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. There the petitioners sought declaratory judgment, injunctive relief and damages. The respondents again contended that the N. R. A. B. had exclusive jurisdiction. The Court again emphatically stated:

"We hold that it was error for the courts below to dismiss the complaint for lack of jurisdiction. They took the position that § 3 First (i) of the Railway Labor Act conferred exclusive jurisdiction on the Adjustment Board because the case, in their view, involved interpretation and application of the collective bargaining agreement. But § 3 First (i) by its own terms applies only to *disputes between an employee or group of employees and a carrier or carriers.* This case involves no dispute between employee and employer but to the contrary is a suit *by employees against the bargaining agent to enforce their statutory right not to be unfairly discriminated against by it in bargaining.* The Adjustment Board has no power under § 3 First (i) or any other provision of the Act to protect them from such discrimination." (Emphasis added.)

The Court then pointed out that "for this reason the decision in Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795, is not applicable here. The courts below also relied on Hayes v. Union Pacific R. Co., 9 Cir., 184 F.2d 337, certiorari denied, 340 U.S. 942, 71 S.Ct. 506, 95 L.Ed. 680, but for the reasons set forth in the text *we believe that case was decided incorrectly.*" (Footnote 4.) It should be noted that we also relied on the Hayes case for our holding in Davis.

Following this line of cases the Supreme Court of Texas held in 1958, in Choate v. Grand International Brotherhood of Locomotive Engineers, 159 Tex. 1, 314 S.W.2d 795, 798, that state courts had jurisdiction of a suit for determination of the validity of the union's application of a working agreement. This again was a suit by present employees against their bargaining representative, who contended that the subject matter lay within the exclusive jurisdiction of the N. R. A. B. The Court said:

"It will be noted that the Act refers only to 'disputes between an employee or group of employees and a carrier or carriers.' Controversies between railroad employees and their union are thus not included in the jurisdiction granted thereby. * * * It is equally well settled, however, that both the state and federal courts may entertain a suit by railroad employees against their bargaining representative for a breach of the latter's statutory duty to represent all members of the craft fairly, impartially, in good faith and without hostile discrimination."

The Court said there was no basis for the distinction argued by respondents to the effect that the Steele, Tunstall, Howard, and Conley cases, supra, applied only to racial discrimination cases, saying "no basis for that distinction can be found in the opinions of the Supreme Court of the United States."

Also in 1958, the Federal District Court for the 2nd District of New York, decided Cherico v. Brotherhood of Railroad Trainmen, 167 F.Supp. 635. Again, the defendants sought to dismiss on the ground that the court lacked jurisdiction over the subject matter, and contended that Conley, Howard, and Steele involved only racial discrimination. The Court said:

"It is true that in each of these cases the invidious discrimination which the Supreme Court held violative of the

provisions of the Railway Labor Act was directed against a class of employees because of their race. However, the language of the opinions does not in any way lead to the conclusion that only racial discrimination can be invidious. Indeed, discrimination, wholly apart from race, has been held to give rise to a federal cause of action." (Citing the Mount and Choate cases, supra.)

As late as 1961, the Fourth Circuit had occasion to consider the question in Hosteller v. Brotherhood of Railroad Trainmen, 287 F.2d 457. It said:

"It is well established that, under both the Railway Labor Act and the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. a bargaining agent must fairly and without discrimination represent all employees in the bargaining unit, and that employees discriminatorily treated have recourse to the federal courts." (Citing Steele v. Louisville & N. R. Co., supra; Tunstall v. Brotherhood, etc., supra.)

The Court then held that the acts complained of failed "to constitute the arbitrary discrimination forbidden by the law."

 On the basis of the developments indicated by all of the foregoing cases, decided since the Davis case, we can but conclude that the Railway Labor Act was not intended to confer exclusive jurisdiction on the National Railroad Adjustment Board of cases involving disputes between employees and their bargaining representatives. This conclusion is strengthened in cases like the one before us, where discrimination is alleged, and where in certain circumstances the aggrieved employee might not receive any consideration by the Board.

We do not believe that the Supreme Court of the United States intended to open the doors to Negro employees who allege discrimination on account of race, and lock them to white or other employees who allege discrimination of other kinds.

We realize ours is, in the first instance, a divination contest to say in advance what the Federal Supreme Court will say later, but we are forced to conclude that our holding in the Davis case was incorrect and that the case at bar must be reversed. In so holding we, of course, express no opinion as to the merits of the same, but merely hold that it was error to overrule appellant's demurrers to the several pleas in abatement filed by appellees.

Reversed and remanded.

All the Justices concur except STAKELY, J., not sitting.